UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTHONY CHINN,

        Petitioner,                      Civil No. 04-10321

v.                                              Hon. David M. Lawson
                                              Magistrate Judge Charles E. Binder

PAUL RENICO,

        Respondent.
_____/

**OPINION AND ORDER REJECTING MAGISTRATE JUDGE'S REPORT,
ADOPTING RECOMMENDATION, OVERRULING PETITIONER'S
OBJECTIONS, AND DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Petitioner Anthony Chinn, currently confined at Mound Correctional Facility in Detroit, Michigan, has filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The petitioner was convicted of possession with intent to deliver between 50 and 225 grams of cocaine, Mich. Comp. Laws § 333.7401(2)(a)(iii), felon in possession of a firearm, Mich. Comp. Laws § 750.224f, and possession of a firearm during the commission of a felony (felony firearm), Mich. Comp. Laws § 750.227b, following a jury trial in the Wayne County, Michigan circuit court in 2002. He was sentenced to two years in prison for the felony firearm conviction, ten to twenty years for the drug conviction, and forty months to five years for the felon in possession conviction. The petitioner alleges that he is in custody in violation of federal law because an involuntary confession was admitted as evidence against him in violation of the Fifth Amendment. This matter was referred to Magistrate Judge Charles E. Binder, who issued a report on April 10, 2006 recommending that the petition be denied. On May 8, 2006, the petitioner filed his objections to the Report and Recommendation. This matter is now before the Court for *de novo* review.

The magistrate judge concluded in his report that the petitioner's confession "could be considered involuntary under sixth circuit and Supreme Court precedent," R&R at 11, but he found that the admission of the confession was harmless error under *Brecht v. Abrahamson*, 507 U.S. 619 (1995). The petitioner objected on the ground that the magistrate judge applied the wrong harmless error standard. The petitioner contends that the standard set forth in *Chapman v. California*, 386 U.S. 18 (1967), should govern this case. The respondent filed no objections and no response to the petitioner's objections.

The Court concludes that the proper standard under which to assess the prejudicial impact of a constitutional error on habeas review is the one announced in *Brecht*; however, the magistrate judge misapplied that standard because he confounded the question whether the challenged evidence "'had substantial and injurious effect or influence in determining the jury's verdict'" *Brecht*, 507 U.S. at 623 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)), with the matter of the sufficiency of evidence to support the conviction. However, the Court finds on *de novo* review that the state courts' conclusion that the petitioner's confession was voluntary was not contrary to and did not unreasonably apply federal law as determined by the Supreme Court. Therefore, the Court will deny the petition.

I.

The petitioner's convictions arise from a drug raid conducted on his home on April 14, 2000. The state court of appeals described the events of that day as follows:

> On April 14, 2000, officers from the Detroit Police Department conducted a raid, pursuant to a search warrant, at a home located on Seyburn Street in Detroit. After forcing entry into the home and failing to find anyone on the main floor, officers proceeded to the basement. In the basement, which defendant was using as a bedroom, the officers found defendant alone. Several weapons were recovered in and around the bed located in the basement. In addition, on a dresser top located

within an arms reach of the bed, a plastic baggie containing a cocaine-like substance was found. The substance weighed 9.43 grams and was later positively identified as containing cocaine. In the refrigerator of the home's kitchen located on the main floor of the house, a brown paper bag containing three, knotted plastic baggies of a powdery substance was also found. The substance weighed 70.82 grams and was later positively identified as containing cocaine. It had an estimated worth of $1,500 to $2,000.

Another man resided, and was found, on the upper level of the home. No firearms or narcotics were seized in the vicinity of this other man and nothing was confiscated from the upstairs. The man was not arrested. Defendant was arrested and charged with the crimes for which he was convicted. . . .

Defendant told officers that the house belonged to him. When asked for his address, defendant gave the address of the home that the police raided. In addition, defendant's driver's license confirmed that he lived at the address. Defendant had lived at the house for twenty years. In the basement, where defendant admitted he slept, four weapons and 9.63 grams of cocaine were recovered. A search of defendant revealed that he was in possession of $580. An additional sum of cash, approximately $307, was also found. During an interview with Officer Byron McGhee, defendant was asked how much "cocaine did you have in your house today?" Defendant replied "about four ounces or less." There was testimony that an ounce of cocaine is equivalent to approximately twenty-eight grams. Thus, four ounces of cocaine is approximately 112 grams. Defendant indicated that he was selling cocaine for $10 a rock and had sold about $200 worth of cocaine that day. . . .

Defendant additionally claimed that he was coerced into making his statement because officers told him that, if he agreed to the statements and assisted the police, he would be released.

*People v. Chinn*, No. 242765, 2003 WL 22902877, *1-3 (Mich. Ct. App. Dec. 9, 2003).

Just before trial began, a hearing was held to determine the voluntariness of the confession at which Officers McGhee and Isaac Ciers testified. Both were involved in the search of the petitioner's home. Officer McGhee interviewed the petitioner in the kitchen of the petitioner's home during the search. No other officers were present for the interview. The petitioner informed McGhee that he had graduated from high school and had two years of college. McGhee testified that he had the petitioner read his constitutional rights from a pre-printed form out loud to ensure

that the petitioner understood his rights. After reading from the form, the petitioner initialed each right on the form. McGhee said that the petitioner did not appear to be under the influence of alcohol or drugs. The petitioner was handcuffed during the interview, which lasted approximately 35 minutes.

According to McGhee, the petitioner agreed to answer questions. McGhee recorded his questions and the petitioner's answers on the back of a form used during interrogations, referred to by the parties as the interrogation record. At the end of the interrogation, McGhee had the petitioner initial each answer to verify its accuracy. After the interview, the petitioner was taken to the police station but he was not booked. McGhee testified that instead, the petitioner was discharged after the officer in charge decided to have the petitioner help the police obtain additional information about narcotics:

> A. He was discharged, pending.
> Q. Okay. So, it wasn't your policy in this case to book Mr. Chinn?
> A. We made a determination at the precinct as far as if he was booked then or if, or obtain a not-in-custody warrant at a later date.
> Q. You recognized at that time that you had, in all likelihood, between 50 and 225 grams of narcotics?
> A. In the weight amount.
> Q. You knew you had a lot?
> A. It was quite a bit, yes.
> Q. You made a decision collectively not to book Mr. Chinn at that point?
> [objection]
> Q. You made a decision not to book Mr. Chinn?
> A. It was not my decision. It was the officer in charge's decision whether he was to be booked. It was not my decision.
> Q. If you know, why was that?
> A. We had, after we had taken him to the precinct, there was decision as far as him, as far as us obtaining information to get additional narcotics.
> Q. Okay. And that would have been done in exchange for leniency; is that correct, sir?
> A. No, it was not, because he was advised this case was not going away.
> Q. So, it, well, was there any type of inducement offered for him to be released and work with you?

A. No.
. . .
Q. Did you give, did you have any discussions whatsoever at the house on Seyburn with the Defendant in which you promised any kind of leniency in exchange for a statement?
A. No.
Q. Did you make any threats about what would happen to him if he did not make a statement?
A. No.

Hr'g Tr. 17-20, Mar. 18, 2002 [dkt # 16]. On cross-examination, the petitioner's attorney pointed out to Officer McGhee that the interrogation record said "used marijuana." *Id.* at 17. This appears to contradict McGhee's testimony that the petitioner was not under the influence of any substance, although McGhee was not asked specifically to explain the inconsistency.

The petitioner testified at the hearing that he was under the influence of marijuana during the interrogation. He had smoked two joints about ten or twenty minutes prior to the raid. The petitioner said that he was told by Officers McGhee and Ciers that he would be released if he signed the statements on the back of the interrogation record:

Q. Okay. What did they tell you, if you can recall?
A. Upon signing those statements?
Q. Well, before you made the statement, sir.
A. Well, it was, if I, if I agreed to sign those statements and assist in some way, that I would be released.
Q. Okay. Who made that statement to you, if you recall, sir?
A. It was a collective conversation.
Q. A collective conversation between whom, sir?
A. A couple of officers and myself. A few officers.
Q. Have you seen anybody here today that was one of the officers involved in the statement?
A. Yes.
Q. Who?
A. Officer Ciers.
Q. Anybody else?
A. Officer McGhee, just left.
Q. . . . What was indicated, if you made the statement, what did they say that they would do?

>   A. They would let me go.
>   Q. You were arrested?
>   A. I was taken to the station.
>   Q. Okay.
>   A. And I was fingerprinted and they let me out the front door.

*Id.* at 22-23. On cross-examination, the petitioner testified that Officer Ciers made promises to him in the kitchen of his home during the search:

>   Q. Okay. So, tell me exactly, as you can remember to the best of your ability to remember, what you're saying Sergeant Ciers told you about giving a statement.
>   A. If I made this agreement to assist them, I would be let go.
>   Q. Okay. If you made an agreement to assist him, you would be let go?
>   A. Um-hmm.
>   Q. So he didn't say, if you make a statement, I'll let you go. He said, if you assist me, I'll let you go. Is that what you're saying?
>   A. If I signed those papers, I'll be let go.
>   Q. Well, now, that's not what you just told me before, is it?
>   A. Yeah. If I sign those papers and I assist them, I'll be let go.
>   Q. Okay. So, you're contending Sergeant Ciers told you that, correct?
>   A. Correct.
>   Q. In the kitchen, correct?
>   A. Correct.
>   . . .
>   Q. . . . What did Officer McGhee say to you about making the statement?
>   A. As I said before, this was a collective conversation. And that's what was stated.
>   Q. I'm not asking you what kind of conversation it was, sir. The question is, what is it that you contend Officer McGhee said to you?
>   A. As I said, if I signed these statements and assist them, I would be let go.
>   Q. Okay. So, you also had a conversation with them when you got to the police station, correct?
>   A. Not really.
>   Q. No?
>   A. Not really. The decision was already made.

*Id.* at 25-28.

In rebuttal, the prosecution called Sergeant Isaac Ciers. He testified that he was the officer in charge of the search of the petitioner's home. Ciers said that McGhee conducted the interview of the petitioner by himself. Ciers denied participating in the interview in any way, although he

spoke to the petitioner later that day at the police station about the petitioner's cooperation. This conversation was not documented. Ciers explained:

> A. The conversation was in regards to Mr. Chinn cooperating, in which case if he did, the charges would not be brought, although we would type up the paperwork. However, if he did not or if he failed to do what he had agreed to do, then we would file the warrant.
> Q. Why is it important not to put those kinds of conversations in your police reports?
> A. Jeopardy in terms of Mr. Chinn, if he wanted to cooperate.
> Q. So, it's for his protection?
> A. Correct.

*Id.* at 33.

After the testimony, the petitioner's attorney, Craig Tank, moved to exclude the statement the petitioner made to the police during the search of his home. He argued that the state had failed to "establish[] that the statements were freely made and voluntary." *Id.* at 35. Mr. Tank pointed out the conflict in the testimony of Officers McGhee and Ciers. Officer McGhee testified that the petitioner "was advised this case was not going away." *Id.* at 18, while Officer Ciers testified that if the petitioner cooperated, "the charges would not be brought." *Id.* at 33. In light of the petitioner's testimony regarding promises made to him regarding leniency and his use of marijuana, Mr. Tank argued that the court should find the statements involuntary. The court denied the motion, stating "I don't see anything that the police did that was coercive, subterfuge or otherwise, and that the statement was taken voluntarily." *Id.* at 36.

The trial began immediately following the evidentiary hearing. At trial, Officers Ciers and McGhee testified to the facts as described in the Michigan Court of Appeals opinion quoted above. Officer Ciers testified that he found nine grams of cocaine on a dresser in the basement of the petitioner's home, which the petitioner was using as his bedroom, and 70.82 grams of cocaine in the

refrigerator on the first floor of the house. Officer McGhee testified that he interviewed the petitioner during the search. According to McGhee, the petitioner told him that he had lived at the house being searched for about twenty years; that he had about four ounces or less of cocaine in the house; that he was selling the cocaine for about ten dollars a rock; and that he had sold about $200 worth of cocaine earlier that day. In addition, Officer William Galen testified that a loaded Webley six-shot revolver was found on the petitioner's bed; a loaded Bryco .38 caliber blue steel automatic was found on the floor near the petitioner's bed; and a loaded .38 caliber five-shot revolver was found between box spring and mattress on the petitioner's bed. At the conclusion of the trial, the jury found the petitioner guilty on all three counts.

On appeal, the petitioner first argued that there was insufficient evidence that he possessed the 70.82 grams of cocaine found in the refrigerator. The Michigan Court of Appeals affirmed in an unpublished *per curiam* opinion, finding more than enough evidence to support a finding of constructive possession. In doing so, the court of appeals relied heavily on the statements made by the petitioner to Officer McGhee.

The petitioner also raised the argument he raises in his habeas petition, that his statements to the police were not voluntary, were made only in response to promises by the police that he would be released, and should have been suppressed. After noting that "[t]he ultimate test of admissibility is whether the totality of the circumstances surrounding the making of the confession indicates that it was freely and voluntarily made," *Chinn*, 2003 WL 22902877, at *3, the court of appeals concluded that there was no coercive conduct and the statements were voluntary:

> During the [evidentiary] hearing, defendant could not identify the officers who allegedly made promises to him. He testified that it was "probably" Issac Criers [sic], the officer in charge of the case. He subsequently indicated that McGhee also made the statements. McGhee testified that defendant was not promised leniency in

exchange for his statement. Criers [sic] testified that McGhee conducted the interview alone. Criers [sic] talked to defendant only at the police station after defendant gave his statement. . . . Reviewing the totality of the circumstances, and giving due deference to the trial court's finding of fact that there was no coercion, we agree that defendant's statement to Officer McGhee was voluntary. The trial court did not err in denying defendant's motion to suppress.

*Id.* at *3.

The petitioner then filed an application for leave to appeal in the Michigan Supreme Court where he raised the same claims. On June 30, 2004, the supreme court denied the petitioner's application for leave to appeal because it was not persuaded that the questions presented should be reviewed. *People v. Chinn*, 470 Mich. 886, 682 N.W.2d 91 (2004) (table).

On December 6, 2004, the petitioner filed his petitioner for a writ of habeas corpus, raising only the following issue:

> WHETHER, THE STATE COURT FINDING OF PETITIONER'S CONFESSION STATEMENT TO POLICE, TO BE VOLUNTARY AND ADMISSIBLE, WAS CONTRARY TO, OR AN UNREASONABLE APPLICATION OF, CLEARLY ESTABLISHED FEDERAL LAW AS DETERMINED BY UNITED STATES SUPREME COURT, WHICH VIOLATES PETITIONER'S 5TH AMENDMENT RIGHTS OF THE U.S. CONSTITUTION.

As noted above, the case was referred to Magistrate Judge Binder on November 28, 2005, and on April 10, 2006, the magistrate judge issued his report and recommendation.

II.

The petitioner's main objection to the report focuses on the harmless error standard that should be applied. As noted above, the magistrate judge concluded that the proper standard is the one found in *Brecht v. Abrahamson*, but then he concluded that the error was harmless because "the

evidence found in Petitioner's residence was more than sufficient to support the jury verdict." R&R at 12. The harmless error standard to be applied to constitutional error on direct review is the one found in *Chapman v. California*, 386 U.S. 18, 24 (1967), where the Supreme Court held that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." Under the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), which govern this case, the Court must apply a deferential standard of review to the legal findings of state courts. However, where the state court did not evaluate the merits of the petitioner's federal claim, the deferential standard of review prescribed by the AEDPA cannot be applied, since "[t]his statute by its own terms is applicable only to habeas claims that were adjudicated on the merits in State court. . . . Where, as here, the state court did not assess the merits of a claim properly raised in a habeas petition . . . questions of law and mixed questions of law and fact [are reviewed] de novo." *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir.2003) (internal quotes and citations omitted); *see also Clinkscale v. Carter*, 375 F.3d 430, 436 (6th Cir.2004) (holding that where "no state court has adjudicated the merits of Clinkscale's ineffective assistance claim ... the deferential standard of review set forth in section 2254(d) is inapplicable"); *Higgins v. Renico*, 362 F. Supp. 2d 904, 915 (E.D. Mich. 2005), *aff'd*, 470 F.3d 624 (6th Cir. 2006). Under that rationale, one might conclude that federal courts should apply the *Chapman* standard when assessing the harmlessness of constitutional error when the state court never reached that issue.

However, in *Fry v. Pliler*, 127 S. Ct. 2321 (2007), the Supreme Court held that a federal habeas court "must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht*, whether or not the state

appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman* . . . ." 127 S. Ct. at 2328; *see also Vasquez v. Jones*, 496 F.3d 564, 575 (6th Cir. 2007). Therefore, the magistrate judge applied the correct standard.

Nonetheless, the manner in which the magistrate judge applied this test was by determining whether the conviction could be sustained despite the evidence of the confession. That was not a proper application of the *Brecht* standard. As the Sixth Circuit explained in *Kyger v. Carlton*, 146 F.3d 374 (6th Cir. 1988):

> The district court examined the evidence and found that, subtracting the problematic evidence, there was still more than enough evidence to convict Kyger. The court's answer to this question was probably right, to be sure, but it was asking the wrong question. The *Brecht* test does not say "only errors that turn acquittals into convictions are harmful." As Justice Stevens put it in *Brecht*, "the question is not 'were they [the jurors] right in their judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision. . . .'" *Brecht*, 507 U.S. at 642-43 (Stevens, J., concurring) (alteration in original) (quoting *Kotteakos*, 328 U.S. at 764).

*Id.* at 381-82 (footnote omitted). The Court must conclude that the magistrate judge misapplied the *Brecht* standard in this case.

That error does not change the import of the recommendation, however. This Court must review the matter *de novo*, including the question whether the state court incorrectly decided the voluntariness issue. In doing so, the Court uses the deferential standard set forth in the AEDPA. As amended, 28 U.S.C. § 2254(d) imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Therefore, federal courts are bound by a state court's adjudication of a petitioner's claims unless the state court's decision was contrary to or involved an unreasonable application of clearly established federal law. *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998). Mere error by the state court will not justify issuance of the writ; rather, the state court's application of federal law "must have been objectively unreasonable." *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000) (internal quotes omitted)). Additionally, this Court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."); *see also West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (stating that "[t]he court gives complete deference to state court findings of historical fact unless they are clearly erroneous").

The Supreme Court has explained the proper application of the "contrary to" clause as follows:

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . .
>
> A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [the Court's] precedent.

*Williams*, 529 U.S. at 405-06.

The Supreme Court has held that a federal court should analyze a claim for habeas corpus relief under the "unreasonable application" clause of § 2254(d)(1) "when a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case." *Id.* at 409. The Court defined "unreasonable application" as follows:

> [A] federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. . . .
>
> [A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law. . . . Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* at 409, 410-11. *See also Davis v. Coyle*, 475 F.3d 761, 766 (6th Cir. 2007); *King v. Bobby*, 433 F.3d 483, 489 (6th Cir. 2006); *Harbison v. Bell*, 408 F.3d 823, 828-29 (6th Cir. 2005); *Rockwell v. Yukins*, 341 F.3d 507, 512 (6th Cir. 2003) (en banc).

The Fifth Amendment privilege against compulsory self-incrimination bars the admission of involuntary confessions. *See Colorado v. Connelly*, 479 U.S. 157, 163-64 (1986). A confession is considered involuntary if (1) the police extorted the confession by means of coercive activity; (2) the coercion in question was sufficient to overbear the will of the accused; and (3) the will of the accused was in fact overborne "because of the coercive police activity in question." *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1988). The ultimate question is "whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution." *Miller v. Fenton*, 474 U.S. 104, 112 (1985). Factors to consider include the presence or absence of police coercion (a "crucial element"), length of interrogation,

location of interrogation, continuity of interrogation, the suspect's maturity and education, the suspect's physical condition and mental health, and whether the suspect was advised of his or her *Miranda* rights. *Withrow v. Williams*, 507 U.S. 680, 693-94 (1993). Without coercive police activity, however, a confession should not be deemed involuntary. *Connelly*, 479 U.S. at 167 (stating that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause").

A confession coerced by threats, violence, promises, or improper influence is not voluntary. *Bram v. United States*, 168 U.S. 532, 542-43 (1897); *see Lynumn v. Illinois*, 372 U.S. 528, 534 (1963). "An admission is deemed to be coerced when the conduct of law enforcement officials is such as to overbear the accused's will to resist." *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994) (citing *Beckwith v. United States*, 425 U.S. 341, 347-48 (1976)).

In *Williams v. Withrow*, 944 F.2d 284 (6th Cir. 1991), *rev'd in part on other grounds*, 507 U.S. 680 (1993), the Sixth Circuit explained that promises of leniency can render a statement involuntary:

> We recognize that the success of a criminal investigation often hinges on obtaining information from uncooperative individuals. Indeed, many otherwise unobtainable convictions are secured through extending immunity in exchange for a defendant's testimony against more culpable co-defendants. The necessity of foregoing the prosecution of an informant in order to convict the ringleaders is an altogether different situation from the deliberate inducement of inculpatory statements through illusory promises of leniency. Even in situations where immunity is not envisaged, we have no doubt that effective interrogation techniques require, to some extent, a carrot-and-stick approach to eliciting information from an uncooperative suspect. However, when promises of leniency, coupled with threats of immediate imprisonment, have a coercive effect on a suspect, we are obliged to inquire whether "the 'coercion' in question was sufficient to overbear the will of the accused."

*Williams*, 944 F.2d at 289 (quoting *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1989)). More recently, that court has summarized Sixth Circuit law on the subject in holding that "promises of

leniency may be coercive if they are broken or illusory." *United States v. Johnson*, 351 F.3d 254, 262 (6th Cir. 2003).

The Court believes that the magistrate judge's report must be rejected because the state courts' determination that the confession was voluntary is not contrary to federal law or based on an unreasonable interpretation of the facts. The magistrate judge determined that the petitioner's confession was not voluntary because it was induced by promises of leniency.

At the evidentiary hearing, Officer McGhee testified that he never promised the petitioner any leniency in exchange for his statement and that no other officer was present during the interview. Officer Ciers testified that he was not present at the interview, but the petitioner was offered leniency in exchange for his cooperation once he was taken to the police station. This happened after the petitioner gave his statement to Officer McGhee. The only possible conflict in their testimony comes from McGhee's testimony that the petitioner "was advised this case was not going away," Hr'g Tr. 18, Mar. 18, 2002, and Ciers' testimony that "if he did [cooperate], the charges would not be brought, although we would type up the paperwork." Hr'g Tr. 33, Mar. 18, 2002. Contrary to the magistrate judge's contention, the testimony of both officers can be true. McGhee interviewed the petitioner at the house while the search was being conducted. McGhee testified that he did not make the decision not to book the petitioner. It appears that the decision was made later by Ciers after the statement was given and the petitioner was taken to the police station. Perhaps McGhee was not aware that Ciers was considering offering such a deal to the petitioner. Just because Officer Ciers later decided not to book the petitioner does not mean Officer McGhee was lying when he swore that he never promised the petitioner leniency. It is reasonable, therefore, to assume that McGhee was telling the truth.

The petitioner has a high school education and two years of college. He had been arrested before and knew his rights. Officer McGhee had the petitioner read his rights out loud to ensure he understood. The interview lasted about 35 minutes. The petitioner may have been under the influence of marijuana. However, assuming McGhee was telling the truth, which the state courts appear to have done, there was no coercion. "[C]oercive police activity is a necessary predicate to finding that a confession is not 'voluntary' within the meaning of the Due Process Clause." *Connelly*, 479 U.S. at 167.

The trial court, after hearing all the evidence, stated, "I don't see anything that the police did that was coercive, subterfuge or otherwise, and that the statement was taken voluntarily." Hr'g Tr. 36, Mar. 18, 2002. The court of appeals listed all the factors to consider in deciding whether a confession is voluntary, concluding that "Reviewing the totality of the circumstances, and giving due deference to the trial court's finding of fact that there was no coercion, we agree that defendant's statement to Officer McGhee was voluntary." *Chinn*, 2003 WL22902877, at *3. The voluntariness of a confession is a mixed question of fact and law that this Court must review with the deference the AEDPA demands. *See Vasquez v. Jones*, 496 F.3d 564, 568 (6th Cir. 2007) (holding that the court "'review[s] the legal conclusions of the district court sitting in habeas *de novo* and the factual findings of both the state trial and appellate courts for clear error'") (quoting *Hamilton v. Morgan,* 474 F.3d 854, 857-58 (6th Cir. 2007)). The state courts' decision that the confession was voluntary, therefore, is not contrary to federal law, an unreasonable application of federal law, or an unreasonable determination of the facts in light of the evidence.

III.

The Court concludes that the magistrate judge correctly recommended that the petition for writ of habeas corpus be denied, but the Court cannot accept the reasoning.

Accordingly, it is **ORDERED** that the petitioner's objections to the magistrate judge's Report and Recommendation [dkt # 26] are **OVERRRULED**.

It is further **ORDERED** that the magistrate judge's Report [dkt # 23] **REJECTED** and the Recommendation is **ADOPTED**.

It is further **ORDERED** that the petition for a writ of habeas corpus is **DENIED**.

s/David M. Lawson  
DAVID M. LAWSON  
United States District Judge

Dated: December 17, 2007

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on December 17, 2007.

s/Felicia M. Moses  
FELICIA M. MOSES

---